Filed 2/28/14  In re L.L. CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re L.L., a Person Coming Under the Juvenile Court Law. | H039271 (Santa Clara County Super. Ct. No. JD21307) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, Plaintiff and Respondent, v. T.N., Defendant and Appellant; L.L., Appellant. | |

T.N. and T.L. are the parents of L.L., who was born in September 2011.  T.N., the minor's mother, appeals from an order declaring him to be a dependent of the court pursuant to Welfare and Institutions Code section 300.[1]  The mother contends:  there was insufficient evidence to support the juvenile court's determination that the minor was

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

described in section 300, subdivision (a); and the juvenile court failed to consider and weigh the conflicting evidence under the correct legal standard. The minor has also appealed from the order and contends: the juvenile court erred when it dismissed the section 300, subdivision (e) allegations; the juvenile court violated his right to due process when it dismissed these allegations without following the correct procedures and without determining whether the dismissal was in the interests of justice and the welfare of the minor; and the juvenile court abused its discretion when it denied his request to conform the petition to proof. For the reasons stated below, the order is affirmed.

## I. Procedural and Factual Background

### A. The Petitions

On July 12, 2012, the Department filed a petition alleging that the minor, who was then nine months old, came within the provisions of section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), and (e) (severe physical abuse). The section 300, subdivisions (a), (b), and (e) allegations of the petition stated: the minor had suffered severe physical abuse that resulted in serious brain trauma and seizures; when he was brought to the hospital on July 7, 2012, the physicians determined that the minor had suffered two brain hemorrhages; and the attending physician opined that the injuries were most consistent with an abusive head injury. The petition also stated: T.L., the father,[2] placed the minor at risk of severe physical harm by holding him over a second story balcony and threatening to drop him if the mother ended their relationship; and the mother, a pharmacist, gave the minor a half dose of an adult relative's Phenergan to control his vomiting despite manufacturer warnings that state the drug should not be given to children under the age of two. The section 300, subdivision (b) allegations

---

[2] Presumed father status for the minor was confirmed at the detention hearing. The father is not a party to this appeal.

included the additional facts: the father had a history of domestic violence against the mother while in the minor's presence; there were charges pending against the father for domestic battery and false imprisonment; the mother obtained a restraining order restricting the father's contact with the mother and the minor; the minor developed normally until he was three months old when he started losing weight despite being treated for gastroesophageal reflux (GERD); and his condition was diagnosed as psycho-social failure to thrive since test results provided no medical or organic explanation for the minor's slow development.

On the same day that the petition was filed, the Department placed the minor into protective custody pursuant to a warrant issued by the juvenile court. Four days later, the Department filed a first amended section 300 petition to reflect that the minor had been placed into protective custody and to consolidate the domestic violence allegations. At the detention hearing, the juvenile court detained the minor and ordered supervised visitation for the mother three times per week for two hours. It ordered supervised visitation for the father twice per week for two hours once the restraining order prohibiting contact with the minor was modified.

In August 2012, the Department filed its second amended petition. The second amended petition removed the section 300, subdivisions (a), (b), and (e) allegations that the mother used Phenergan to control the minor's vomiting and that the father had held the minor over the balcony.

In November 2012, the Department filed its third amended petition. The section 300, subdivisions (a) and (b) allegations were amended to also include: the minor was in the custody of the mother or the maternal grandmother when he suffered his injuries; the mother denied abusing the minor but she could not offer an explanation that was consistent with the head injury he sustained; and pursuant to section 355.1, subdivision (a), the minor suffered an injury of a nature that ordinarily would not be

3

sustained except as the result of the unreasonable or neglectful acts or omissions of either parent. The section 300, subdivision (e) allegations remained the same.

## B. The Jurisdiction/Disposition Report

The jurisdiction/disposition report, dated August 8, 2012, recommended that the juvenile court sustain the second amended petition and that the parents be provided family reunification services. The report referred to the prior child welfare history. On May 29, 2012, the police responded to a family disturbance in which the mother reported that the father slapped and strangled her. She also stated that there had been 12 to 15 unreported physical incidents between her and the father. The father was arrested and booked into jail. A social worker met with the mother who stated that the father had held the minor over a balcony and threatened to drop him if she left. The social worker provided the mother with domestic violence resources.

The report also summarized the minor's medical records. At 1:38 a.m. on July 2, 2012, the mother summoned an ambulance after finding the minor face down in his pack crib and not moving. When the mother picked him up, he was limp and unresponsive.[3] He eventually took deep irregular breaths and "stared off." En route to the Kaiser emergency room, the minor had an episode of grunting for approximately 30 seconds. The treating physician opined that the episode was related to his positioning in a pack crib.

Two days later, at 11:31 p.m., the mother brought the minor back to the emergency room and reported that he had been projectile vomiting and exhibiting seizure-like movements. Shortly thereafter, medical personnel observed the minor on a gurney where he lay "unresponsive, not moving his extremities, with a blank stare, which

---

[3] However, the mother told the paramedics that the minor had been lying in bed next to her.

lasted 1 minute." The mother did not report any trauma to the minor but later admitted that she had given him half of a Phenergan rectal 12.5 mg. suppository earlier in the evening. Dr. Eugene Shek stated that Phenergan was not recommended for children under the age of two. The minor was admitted for further testing and evaluation.

The magnetic resonance imaging (MRI) results indicated three areas in the minor's brain which suggested "multiple large vessel acute infarcts." The results of his electroencephalogram (EEG) were "highly suspicious for increased risk for focal onset seizures and the focality correlate[d] with the diffusion abnormality on MRI." When Dr. Ann Lewis discussed the results of these tests with the mother, the mother asked about the possibility of trauma causing the most recent episode or the episode on July 2. She denied any knowledge of trauma but noted that the minor had a bump on his forehead. Dr. Ramin Saket was then asked to review the MRI for indications of trauma. Dr. Saket reviewed the MRI and stated that his findings were "suggestive of multiple hematomas of varying ages raising the possibility for traumatic injury."

On July 10, 2012, Dr. Catherine Albin completed a child protection evaluation of the minor. The minor's MRI identified two brain hemorrhages of different ages. There was a "chronic right front subdural hygroma," which was estimated to be several weeks old and "a subacute cerebellar bleed which include[d] a subarachnoid component," which was days old. There was also evidence of diffuse brain injury. Dr. Albin stated that prolonged seizures could create the diffusion pattern seen on the MRI, but the findings would be temporary. Since abuse-related injuries would be expected to show permanent findings, a follow-up MRI was recommended in two months. According to Dr. Albin, the minor did not have any metabolic problems that would have accounted for the brain hemorrhages and thus she concluded that "the finding of subdural blood collections of different ages with no evidence of other medical diagnosis is most consistent with abusive head injury."

Dr. Albin also noted that the minor grew well until he was three and one-half months old. While in the hospital, he was "demonstrating good weight gain." Since the diagnosis of GERD was based on history and weight loss, the minor was going to be tested that day to define the current level of reflux. Though the minor was prescribed medication for GERD, the mother had stopped giving it to him without medical advice. The minor was diagnosed with eczema in December 2011. However, it was described as mild in February and as dry skin in June.

Dr. Albin spoke with the mother, who stated that the minor had had no contact with the father since May 28, 2012. The mother also stated that the maternal grandmother had provided daycare "on occasion," but most of his care had been provided at a daycare home since June 1, 2012. At that time, Dr. Albin stated that the most acute of the bleeding episodes was less than two to three weeks old and could have been consistent with the minor's presentation at the emergency room on July 2, 2012. The other was likely more than a month old and could have occurred when the father was present, but he could not have been responsible for both injuries. The mother reported that the maternal grandmother witnessed the minor fall from a bed to a carpeted floor on June 23, 2011. The mother also witnessed the minor fall from a bed approximately two months earlier. According to Dr. Albin, neither of these incidents were "likely to have resulted in injuries that would lead to intracranial hemorrhage, neurologic injury/seizures," and the mother and the maternal grandmother "seem[ed] to be the most consistent care providers during the cumulative time frame."

Extensive diagnostic testing failed to identify any medical cause for the minor's brain injuries. Dr. Albin also noted that other factors suggesting abuse were: domestic violence between the parents, weight loss consistent with psycho-social failure to thrive, and the mother's decisions that seemed contrary to her training as a pharmacist. Since some tests were pending, there remained some uncertainty as to the cause of the minor's

6

injuries. However, Dr. Albin opined that the evidence supported a diagnosis of abuse and that the most recent episodes occurred while the minor was in the care of the mother or the maternal grandmother.

Dr. Albin discussed her current diagnoses of abusive head injury and psycho-social failure with the mother. The mother seemed unable to accept that a fall from a bed to a carpeted floor was unlikely to have caused serious brain injury and seizures. The mother was also aware that the minor's feeding assessment was normal, and she blamed the childcare providers and the maternal grandmother for not encouraging him to eat. The mother then revealed that that she had forgotten to tell Dr. Albin the previous day that she had seen the minor fall from a bed and hit his head on a coffee table a couple of months ago. Though the mother acknowledged that Dr. Albin had asked her for all the details and that she was not hurried during the interview, she claimed that she had simply forgotten to mention it. Dr. Albin did not believe her. In Dr. Albin's experience, the mother's statement was a common fabrication to explain serious injuries.

The jurisdiction/disposition report included the mother's statements to the social worker. On July 13, 2012, the social worker met with the mother. The mother denied hurting the minor and stated that he rolled off the bed onto a carpeted floor on several occasions. The first incident occurred on May 14, 2012. The minor was swaddled and sleeping on her bed while she and the father were downstairs. When they heard something hit the ground, she immediately went to her bedroom and found the minor on the floor between her bed and the crib. She stated that he was fine after the fall. The minor also fell off the bed while the maternal grandmother was caring for him on June 23, 2012. The grandmother observed a bump on his head and stated that he was fine. The mother claimed that she first learned of this fall from the maternal grandmother on the way to the emergency room on July 4, 2012. However, the maternal grandmother told the social worker that she had told the mother about the fall four to five days after it

7

occurred. The next incident occurred on June 28, 2012. The minor rolled off the mother's bed and his head became stuck between the bed frame and the end table. His body remained on the mattress and he appeared to be fine. On July 1 or 2, 2012, the mother was changing the minor's diaper on a bed. As she reached for the wipes, he rolled off the bed and hit the end table. The minor cried and she noticed a bump on the left side of his head and a blank stare on his face. On July 3, 2012, the mother found the minor's head stuck between her bed and the mesh railing that she had installed on her bed. He appeared fine.

The mother told the social worker that she did not tell Dr. Albin about all of the incidents in which the minor fell because she felt Dr. Albin was "intimidating." She did not believe that hematomas are caused by trauma. The mother also denied giving Phenergan to the minor.

A couple of weeks later, the social worker spoke again with the mother. The mother stated that she told Dr. Shek on July 4, 2012, that she administered .25 of an adult dose of Phenergan to the minor, "because she wanted to take the blame for it." The mother explained that her father administered the medication to the minor.

The jurisdiction/disposition report summarized the information from the initial police report. On July 7, 2012, the mother told the police that the minor had had seizures in the past and that was not uncommon. She learned that he had fallen off the bed on June 24, 2012, while he was in the maternal grandmother's care. She told the police that the minor became very ill, was vomiting and had trouble breathing on July 2, 2012. Though she brought him to Kaiser, he was released. Two days later, he began vomiting and was very lethargic. The minor was taken to the hospital and the physicians found that he had brain hemorrhages.

On July 19, 2012, the mother met with the police at her home and demonstrated how the minor had fallen off beds. She stated that the first incident occurred at the end of

8

May 2012 when the minor fell from the bed to the floor in the master bedroom. He also fell from the bed to the floor in the baby room during the first week of June. The minor wedged himself between the mattress and guard rail towards the end of June. He also wedged himself between the mattress and a night stand table during the same time period. The officer told her that it was difficult to believe that the minor had lodged his head between the guard rail and the mattress and that the minor had made the movements she had described. The mother also stated that being a victim of domestic violence "was very stressful and she cried a lot."

The social worker also interviewed Mr. and Mrs. G., the daycare providers, in mid-July 2012. They have known the minor's parents for approximately two and one-half years. The minor began day care on June 1, 2012. The mother informed them of his GERD and eczema. She told them that he was on medication for GERD, but they had never seen the medication. The minor was always wearing mittens to deter him from scratching himself. They suggested to the mother that the mittens be removed, and that if he began scratching himself, Aquaphor could be applied. The mother told them that his condition would worsen if the treatment for eczema was not followed consistently. She also told them that the minor was fed two ounces of formula every two hours. The G.'s noticed, however, that the minor drank four ounces of formula every two hours. They also stated that the minor had never fallen while in their care and he always slept in a crib. Though the minor could roll well, he could not crawl. The daycare providers stated that the minor's last day in their care was July 3, 2012. On that day, he was healthy and laughing and he ate and slept well. They had never seen the minor have seizures while he was in daycare.

The daycare providers stated that the mother told them that on July 1, 2012, the minor rolled over while she was in the kitchen. When she checked on him, he was on his stomach and breathing heavily as if he was unable to roll onto his back. They were told

9

that the minor was not admitted to the hospital at that time because his condition was not life-threatening.

On July 4, 2012, the mother told the daycare providers that the minor had had seizures and been admitted to the hospital. The mother told Mr. G. that when she tried to feed the minor that day, he began vomiting. He vomited five to six times by approximately 12:00 p.m. The mother then called her parents and they came to her home. The maternal grandfather, a retired pharmacist, brought prescription medication. When the maternal grandparents told the mother that the minor needed the medication, she argued with them. After they called her a "bad mother," she reluctantly allowed the maternal grandfather to administer a diluted dose of the medication. Mr. G. did not remember the name of the medication but the mother told them that the medication had a black box warning. Approximately 25 minutes after the maternal grandparents left, the minor had his first seizure which lasted about three to four minutes. She called her parents again. While they were on the way to the hospital, the minor had another seizure in the car. As the mother was recounting the events of that day to the G.'s, she kept saying, "I'm going to jail." When Mrs. G. asked the mother what she and her parents talked about on the way to the hospital, the mother did not answer her.

According to the daycare providers, the father kept the mother organized. He arranged the child care schedule for the minor before he entered daycare, and he helped her clean her home. Mr. G. stated that the mother's home would appear clean one day and look like it had been hit by a hurricane the following day. In his view, it became very difficult for the mother after the father left the home. The G.'s met with the mother on July 13, 2012, to discuss the minor's placement with them. They felt that she contacted them only to "line up their statements" with hers. The G.'s did not feel that she was truthful with them and they severed their relationship with her.

10

On July 17, 2012, the maternal grandmother told the social worker that the mother returned to work when the minor was four months old and worked four days per week. The maternal grandmother took care of the minor at least three days per week while the paternal grandparents helped care for him during the weekend. She stated that the minor was a "picky eater" and had "severe" eczema so they carried him a lot and did not allow him to crawl.

About a week later, the social worker met with the father. He stated that the minor cried between 9 and 10 p.m. for at least an hour most days when he was one to two months old. Since the mother became frustrated by his crying and yelled at the minor, the father took him away from her. The mother also took the minor out of his car seat while the father was driving. He told the mother several times that it was not safe. After the parents agreed that the minor would sleep in the spare bedroom, the father installed a camera similar to a webcam in the room so he could see the minor even when he was at work. The mother removed the camera from the room.

According to the father, when the minor was about seven to eight months old, he and the mother heard a thump. The minor had fallen from the bed and was on the floor on his stomach. He was also swaddled because they did not want him to scratch himself due to the eczema. The father thought that the mother had put the minor in his crib and she did not tell him that the minor was on the bed.

On July 26, 2012, the social worker met with the mother and Dr. Albin at Kaiser. Dr. Albin discussed her findings, showed them the MRI images, and stated that the MRI needed to be repeated to show more accurate findings. Dr. Albin also discussed the minor's growth. He was in the 25th percentile at birth and was growing well at three months and one week. However, two weeks later, the minor had lost "a lot" of weight and dropped to the 8th percentile. Since that time, he "had consistently fallen off his growth chart." Dr. Albin explained that the minor should have been in the 25th

11

percentile. When the minor was two months old, it was noted that he had dry skin. Dr. Albin stated that eczema does not cause children "to fall off the growth chart."

Dr. Albin also explained psycho-social failure to thrive. She stated that it could be the result of a combination of factors, such as the refusal to feed the child, personality conflicts, a power struggle between the caregiver and the child, or the child's refusal to eat. Dr. Albin stated that GERD was not the cause of the minor's weight issues, because the occupational therapist had found that he had "great feeding mechanics." When the mother stated that she was the only person who could feed the minor, Dr. Albin disagreed and pointed out that he was able to eat for the occupational therapist.

Dr. Albin also discussed the minor's injuries. She stated that the July 5, 2012 MRI revealed a hemorrhage that was more than six weeks old. This injury was not caused by falling off the bed. She described the injury as being from an acceleration/deceleration motion, such as a car crash or a whiplash. It was possible to sustain such an injury from falling off a high area at a high velocity. When the mother pointed out that the minor had elevated white blood counts, which meant he had an infection, Dr. Albin responded that his test for encephalitis was negative. She also noted that the minor "did not present with febrile seizures, which would not appear on MRI or EEG. She stated that L[.] has more complex seizures." Dr. Albin stated that the minor did not have a stroke or a tumor and that differential diagnoses, such as metabolic diseases or genetics, had been ruled out. She explained that there was a "very low suspicion of abuse" when the minor was admitted due to the mother's professional standing at Kaiser. According to Dr. Albin, "something dramatic" happened when the minor was between three months, one week old and three months, three weeks old. She also stated that the most recent injury could have happened on July 1, 2012, not July 3, 2012. She asked if anyone else had cared for the minor on July 1, 2012.

12

The father told the social worker that the mother came to his place of employment on July 16, 2012. The father provided the social worker with photographs captured by the security camera and screen shots of his iPhone to show that the mother was calling him on that day. When the social worker asked the mother about the incident, she denied being at the father's place of employment. She stated that she attempted to call the father to discuss the minor. Though the social worker explained that the no-contact order was to protect her, the mother stated that she had a right to talk to the father.

On July 23, 2012, the social worker met with the paternal grandparents. They reported that the mother came to their home four days earlier and was screaming at them. The paternal grandmother told her to leave or she would call the police. The mother wanted her to come with her to visit the minor. After the mother left, she went to a paternal aunt's house. The paternal uncle told her that they did not want to have anything to do with her and the mother became very upset.

About three days later, the social worker met with the mother, the maternal grandmother, the paternal grandparents, and the paternal aunt and uncle to discuss placement. The mother objected to placement with the paternal grandparents due to their age and stated that she would prefer that the minor be placed in foster care. It was decided that visitation occur outside the paternal grandparents' home. The following day, the minor was placed in the paternal grandparents' home.

Dr. Albin provided a follow-up report, dated August 6, 2012. The tests, which were pending at the time of her last report, showed no abnormalities that would explain the minor's failure to thrive or brain hemorrhages. Thus, the diagnosis was trauma. Dr. Albin also noted that, in retrospect, the episode which brought him to the emergency room on July 2, 2012, "seems likely to have been precipitated by a possible seizure . . . ." If the first seizure occurred on that date, it was "reasonably occurring at the same time of the most recent trauma noted on the basis of the MRI/spinal tap results." Dr. Albin

13

acknowledged that there were many published studies of falls of less than three feet and skull fractures in a small percentage of infants. However, these studies did not describe the onset of seizures or subdural hemorrhages.

During the first supervised visit, the mother held, talked to, fed, and changed the minor. However, when she began talking about Dr. Albin's findings, she became very upset and frustrated. The social worker told her that the visits were for her and the minor to spend time together. A week later, the mother arrived for a visit with the maternal grandparents. The social worker told her that if the maternal grandparents wanted to visit the minor, their visits could be arranged separately. The maternal grandmother held the minor most of the time during the visit, and thus the mother did not have the same level of interaction with the minor that the maternal grandmother did.

In evaluating the case, the social worker expressed concern that the mother did not fully understand the severity of the minor's injuries. She noted that the mother had presented her, Dr. Albin, and the police with different accounts of the minor rolling off the bed. The social worker stated that there was "no doubt" that the parents loved the minor.

Regarding the mother's case plan, the social worker recommended: a certified 52-week Child Abuser's Treatment program; counseling or psychotherapy; a psychological evaluation; and a domestic violence victims' support group.

### C. The Addendum Report

An addendum report, dated August 22, 2012, recommended that the juvenile court sustain the second amended petition and that the parents be provided with reunification services. On August 10, 2012, the social worker spoke with the mother on the phone. The mother became very upset when she talked about the jurisdiction/disposition report. She did not think that the falls caused the minor's injury and she wanted to know what

14

caused it.  The mother also stated that the social worker only felt sorry for the father and that she had never stood up for her.  The mother then stated that the father sat on her stomach when she was pregnant with the minor.  When the social worker asked her why she had not provided this information before, the mother responded, "I didn't have to tell you that."  The mother also stated that she did not think the social worker believed her regarding the domestic violence.

On August 15, 2012, the social worker received an e-mail from the paternal uncle. He explained that the paternal grandparents kept the mother informed of the minor's well-being and allowed her to get his medication from the pharmacy.  The previous day, the paternal grandparents had taken him to Kaiser due to fever and the pediatrician prescribed .8 ml. or 80 mg. of Tylenol every four hours.  The mother told them that she had some Tylenol at home, but the paternal grandparents thought it would be more convenient to get it at Kaiser.  The mother obtained the medication from the pharmacy and told the paternal grandmother to administer 250 mg. of Tylenol.  When the paternal grandmother questioned her, the mother confirmed the dosage.  Dr. Krishnan, the minor's pediatrician, stated that the maximum amount of Tylenol for the minor was 100 mg. Dr. Krishnan also stated that she initially thought that the minor's weight issues were due to GERD.  However, though the minor gained a little weight after he was prescribed medication, his weight was not where it should be.

### D.  The Second Addendum Report

The second addendum report, dated November 30, 2012, recommended that the juvenile court sustain the third amended petition and that the parents be provided with family reunification services.  The social worker attached a report by Dr. Lewis. According to Dr. Lewis, the minor's follow-up MRI showed evidence of permanent injury.  She expected him "to do well, though learning/processing deficits may become

15

more apparent with school performance." She also noted that there was no evidence of a metabolic disorder that could have predisposed the minor to bleeding. The social worker spoke with Dr. Albin about the follow-up MRI. According to Dr. Albin, it showed permanent damage with evidence of atrophy and her opinion that the minor's injuries were caused by trauma remained unchanged. Though the 14-month-old minor was now able to crawl, sit up, and walk with assistance, he was about six months delayed in his development.

Regarding the mother's visitation with the minor, the social worker stated that the mother provided basic care, including feeding, changing diapers, and rocking him to sleep. However, the visitation notes also indicated that the mother rocked the minor to sleep in almost all the visits even though he was not sleepy and was quite active. She also attempted to feed him after being informed that he had already been fed prior to coming to the visits.

### E. The Jurisdiction/Disposition Hearing

The Department submitted the jurisdiction/disposition report, the addendum report, and the second addendum report. The Department also sought to strike the section 300, subdivision (e) allegations in the third amended petition. The mother's counsel stated that it was not submitting any evidence and argued that there was insufficient evidence to support the section 300, subdivision (a) allegations. The minor's counsel objected to the dismissal of the section 300, subdivision (e) allegations, argued that the third amended petition be sustained as to the section 300, subdivisions (a), (b), and (e) allegations, and that the petition be conformed to proof to add an allegation regarding the mother's improperly administering medication to the minor. Following argument, the juvenile court granted the Department's request to strike the section 300, subdivision (e) allegations, denied the minor's request to conform the petition to proof,

16

and sustained the section 300, subdivisions (a) and (b) allegations in the third amended petition.

## II. Discussion

## A. The Mother's Appeal

In order to exercise its jurisdiction over a child in a dependency case, the juvenile court must find that the child is a person described by one or more of the section 300 subdivisions. (*In re Michael D.* (1996) 51 Cal.App.4th 1074, 1082.) It is the Department's burden to prove the jurisdictional facts by a preponderance of the evidence. (§ 355, subd. (a).)

Here, the mother challenges the sufficiency of the evidence to support the jurisdictional finding under section 300, subdivision (a). To adjudge a minor a dependent child pursuant to this subdivision, a court must find that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent." (§ 300, subd. (a).)

The Department contends that the appeal should be dismissed, because the mother did not challenge the juvenile court's jurisdiction under section 300, subdivision (b). "When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence." (*In Alexis E.* (2009) 171 Cal.App.4th 438, 451.) The mother responds, however, that there is a sharp distinction in the degree of risk to the minor in the section 300, subdivisions (a) and (b) orders. She points out that she was found to have inflicted serious physical harm on the minor under section 300, subdivision (a) while she was found to have failed to protect him from serious physical harm under subdivision (b). She thus contends that the

17

section 300, subdivision (a) findings could prejudicially affect future dispositions, placements, or parental rights. Since we agree that the finding on the section 300, subdivision (a) allegations could potentially affect future dependency proceedings, we will exercise our discretion and consider the merits of the mother's appeal. (*In D.C.* (2011) 195 Cal.App.4th 1010, 1015.)

In the present case, the juvenile court relied on the presumption in section 355.1 in sustaining the section 300, subdivision (a) allegations. Section 355.1, subdivision (a) states: "Where the court finds, based upon competent professional evidence, that an injury, injuries, or detrimental condition sustained by a minor is of a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent . . . that finding shall be prima facie evidence that the minor is a person described by subdivision (a), (b), or (d) of Section 300." (§ 355.1, subd. (a).) Subdivision (c) of section 355.1 provides that "[t]he presumption created by subdivision (a) constitutes a presumption affecting the burden of producing evidence." (§ 355.1, subd. (c).) Rebuttal evidence may be in the form of the social worker's report. (*In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1041.)

*In re James B.* (1985) 166 Cal.App.3d 934 (*James B.*) discussed the proper application of the presumption in former section 355.2, which was similar to section 355.1.[4] *James B.* explained that former section 355.2 involved two presumed facts. "The first requires the court to presume a child's injury actually occurred by injury or neglect when the court finds the injury is of the sort which ordinarily would not occur except by

---

[4]    Former section 355.2 provided in relevant part: "Where the court finds, based upon competent professional evidence, that an injury . . . sustained by a minor, of such a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent, [or] guardian, . . . such evidence shall be prima facie evidence that the minor's home is an unfit place . . . and such proof shall be sufficient to support a finding that the minor is described by subdivision (d) of Section 300."

18

abuse or neglect. The second permits the court to presume that, given such an injury, the child's home is unfit. The presumption only survives, however, until the parents or guardian(s) present rebuttal evidence as to either or both presumed facts. Where rebuttal evidence is offered, the presumption in no way relieves the court of its obligation to make factual findings as to the cause of the injury and the fitness of the home." (*James B.*, at p. 937.) Thus, if the parent produces evidence rebutting a prima facie showing, the Department maintains the burden of proving the case on the merits of conflicting evidence. (*Ibid.*) In *James B.*, the parents offered rebuttal evidence, which included their own testimony and that of an expert that the minor's injuries resulted from falls from his bed and the couch as well as testimony regarding the fitness of the home. (*James B.*, at p. 937, fn. 3.) *James B.* held that the juvenile court erred when it "explicitly refrained from finding . . . how the injury actually occurred and whether [the minor's] home was unfit." (*James B.*, at pp. 937-938.)

In the present case, the juvenile court stated: "I do think that Welfare and Institutions Code section 355.1(a) is relevant here. I think there is competent medical evidence that supports the fact that the injuries to this child would not have been sustained without unreasonable or neglectful acts of the parent or guardian. That is prima facie evidence the child is described by sections 300(a), (b) or (d). [¶] The head injuries for this child were fairly significant for his age. Having at least two doctors, Dr. Albin and . . . Dr. Lewis . . . opine that these injuries don't occur in the absence of the abuse or neglect from the parent weighs heavily for this Court. The burden does shift for the parent to explain what happened. The explanation just doesn't make sense to the Court. [¶] And just to be very clear, you know, particularly for appellate purposes, I would say that even if the child falling from the bed . . . did cause these injuries, and even if there is not support for the 300(a), a child this age falling off of a bed repeatedly is certainly neglect on behalf of the parent's part. I do find it problematic for both (a) and (b). I do

19

believe the medical evidence that was presented that falling off of a bed is really not an explanation for these injuries."

The mother argues that the juvenile court "made no reference to rebuttal evidence or to a finding of fact on conflicting evidence" in applying the presumption. She further argues that the juvenile court "employed a legal standard that is not supported by any statutory or case precedent when it ruled that the presumption must necessarily be rebutted by the parent with an explanation of 'what happened.'"

Here, the juvenile court referred to the medical evidence regarding the minor's injury and correctly stated the presumption. It then considered conflicting evidence that the injuries had been sustained when the minor fell off the bed. Unlike in *James B.*, however, the juvenile court did not state that the statutory presumption relieved it of making findings of fact as to how the injury occurred and whether the minor was a person described in section 300, subdivisions (a) and (b). When there is no evidence to the contrary, we presume that the juvenile court made the correct findings. (*In re Merrick V.* (2004) 122 Cal.App.4th 235, 254.) In sustaining the section 300, subdivision (a) allegations, the juvenile court implicitly found that the injuries were caused by abuse perpetrated by the mother.

We next consider whether there was substantial evidence to support the juvenile court's findings as to the section 300, subdivision (a) allegations.

"On appeal, the 'substantial evidence' test is the appropriate standard of review for both the jurisdictional and dispositional findings. [Citations.] The term 'substantial evidence' means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion; it is evidence which is reasonable in nature, credible, and of solid value. [Citation.]" (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.) "It is the trial court's role . . . to weigh the evidence [and] to resolve the conflicts in the evidence. We have no power to judge the effect or value of the evidence, to weigh the evidence, . . . or

20

to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence. [Citations.] Under the substantial evidence rule, we must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact. [Citation.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53 (*Casey D.*).)

The mother contends that there was insufficient evidence that she "nonaccidentally inflicted severe physical harm on the minor." She focuses on Dr. Albin's statements in the Child Protection Evaluation, dated July 10, 2012, that the minor's first traumatic brain injury was described as " several weeks old," and later "likely more than a month old," and that the more recent injury was described as "days old" and "likely less than two-3 weeks old." She points out that the medical evidence established that the minor suffered both his brain injuries after she returned to work at Kaiser four and one-half months prior to his admission to the hospital on July 4, 2012. Noting that the maternal grandmother and the father cared for the minor prior to May 29, 2012, and the maternal grandmother and daycare providers cared for him between June 1 and July 3, 2012, she argues that she rebutted the presumption of section 355.1 and the Department failed to prove the method of injury or the perpetrator of the injury.

As to the method of injury, the minor focuses on Dr. Albin's statement that "falls from a bed would not generally result in this injury unless he fe[l]l directly on his head. A 9 month old would be expected to have some protective reflexes . . . ." The minor points out that Dr. Albin failed to consider that he was typically swaddled in a blanket while sleeping to protect him from scratching his skin. However, this court does not weigh the evidence or resolve conflicts. (*Casey D.*, *supra*, 70 Cal.App.4th at pp. 52-53.) Here, extensive medical testing of the minor failed to identify any medical cause for the minor's brain injuries and two physicians concluded that the minor had been physically abused. Moreover, though some studies indicated that falls of less than three feet resulted

21

in skull fractures in a small percentage of infants, these studies did not describe the onset of seizures or subdural hemorrhages. Thus, the preponderance of the evidence established that the minor's injuries were caused by abuse.

As to the perpetrator of the abuse, we note that the July 5, 2012 MRI showed a hematoma which was more than six weeks old and thus occurred before May 24, 2012. The most recent injury occurred within a week of the onset of the seizures in early July 2012. Since the mother took care of the minor when she was not working, the only other individual who cared for the minor during the two periods when he suffered each injury to his brain was the maternal grandmother. However, there was substantial evidence that the mother, not the maternal grandmother, was responsible for the minor's injuries.

Here, when the mother discussed the events of July 4, 2012, she "kept saying, 'I'm going to jail.'" There was also evidence that she was experiencing severe stress and the minor was not safe in her care. The mother admitted that caring for the minor was difficult and that "the father's presence was necessary for her to manage." When the minor was one or two months old, the mother would yell at him for crying and the father would care for him. The father kept the mother organized and helped clean the home, and it became very difficult for her when he was no longer in the home. The mother acknowledged that being a victim of domestic violence "was very stressful and she cried a lot." She also engaged in behaviors that were potentially very harmful to the minor, such as removing him from his car seat while the father was driving and discontinuing prescribed medication for him without medical advice. Though she was a pharmacist, the mother either gave or allowed the maternal grandfather to give medication to the minor despite the manufacturer's warnings. On another occasion, she told the paternal grandmother to give the minor more than twice the recommended dosage of Tylenol. She also insisted that the minor wear mittens, which prevented him from learning to crawl, and kept him swaddled even after medical reports stated that his condition was

22

"dry skin," and not eczema. In addition, the minor was diagnosed with psycho-social failure to thrive. While others had no difficulty feeding the minor, the mother insisted that he had feeding problems and could only take two ounces of formula.

Moreover, though the mother was told that falls from the bed could not have caused his injuries, she provided different accounts of his falls to Dr. Albin, the social worker, and the police. She initially stated that he fell twice and later stated that he fell five times. She also later added the significant detail that he had hit his head on a table though she did not see the fall. When she demonstrated how the minor had become lodged between the mesh rail and the mattress, the police officer told her that he had a "hard time believing" her. The mother's credibility was further challenged by her inconsistent statements to various individuals. On July 2, 2012, she told the paramedics that she had been co-sleeping with the minor when he began breathing irregularly. However, she told medical personnel at the hospital that she had found him face down and not moving in a pack crib. The mother initially told the police that she had seen the minor have a seizure and that it was not uncommon for him. About a week later, she told the social worker that she had never seen him have a seizure. The mother told a doctor that she had given Phenergan to the minor and later denied giving him the medication. She claimed that she did not go to the father's place of employment and there was security footage of her presence.

In sum, the Department met its burden of proving the jurisdictional facts by a preponderance of the evidence. There was evidence that the minor suffered two brain hemorrhages as well as evidence of the mother's consciousness of guilt, her severe stress in taking care of the minor, her potentially dangerous behaviors involving him, and her lack of credibility. Thus, there was substantial evidence to support the juvenile court's finding that the minor suffered serious physical harm inflicted by the mother.

## B. The Minor's Appeal

### 1. Dismissal of Section 300, Subdivision (e) Allegations

Relying on *In re Sheila B.* (1993) 19 Cal.App.4th 187 (*Sheila B.*), the minor contends that the juvenile court erred when it dismissed the section 300, subdivision (e) allegations, because there was substantial evidence to support them. The minor's reliance on *Sheila B.* is misplaced. In that case, the juvenile court declined to take jurisdiction over the minor after a contested five-day hearing. (*Sheila B.*, at pp. 192-193.) Noting the equivocal nature of the medical evidence and the minor's recantation against her initial allegations, this court held that there was substantial evidence to support the juvenile court's determination that the minor did not come within the provisions of section 300, subdivisions (c) and (d). (*Sheila B.*, at p. 200.) *Sheila B.*, however, did not discuss the issue presented in this case, that is, whether the juvenile court erred in granting the Department's request that the section 300, subdivision (e) allegations be stricken.

The minor also contends that the juvenile court violated his right to due process by failing to hold an order to show cause hearing in which the Department would be required to establish why the section 300, subdivision (e) allegations should be dismissed. He also contends that the juvenile court failed to consider whether the dismissal was in the interests of justice and the welfare of the minor. According to the minor, "the only rationale that appears to be the basis for the dismissal was court expediency."

Procedural due process requires notice to interested parties and a meaningful opportunity to be heard. (*In re Melinda J.* (1991) 234 Cal.App.3d 1413, 1418.) *Allen M. v. Superior Court* (1992) 6 Cal.App.4th 1069 (*Allen M.*) outlined the procedure to be followed when the Department seeks to dismiss a section 300 petition. In that case, the Department filed a petition pursuant to section 300, subdivision (d) and alleged the father sexually abused one of his daughters. (*Allen M.*, at p. 1071.) Jurisdiction over his other daughter was based upon the abuse of her sister pursuant to section 300, subdivision (j).

24

(*Allen M*., at p. 1071.)  After the Department filed a second petition pursuant to section 300, subdivision (b) and alleged the minors were at risk due to domestic violence and the father's abuse of alcohol, the Department sought to dismiss the initial petition on the grounds that there was insufficient evidence to sustain it and the parents had indicated that they would admit the section 300, subdivision (b) allegations.  (*Allen M*., at pp. 1071-1072.)  The minors' counsel opposed the dismissal.  (*Id.* at p. 1072.)

After the juvenile court denied the motion to dismiss, the father sought a writ of mandate.  (*Allen M*., *supra*, 6 Cal.App.4th at p. 1072.)  The reviewing court held that the Department had no discretion to dismiss a petition under section 300 and stated:  "We conclude that when the Department wishes to dismiss a petition (or one of several bases for jurisdiction) it must notify all interested persons in order to afford each the opportunity to object and be heard.  If a parent or minor does object, resolution of the matter is properly by an order to show cause hearing requiring the Department to establish why the petition should be dismissed.  The evidence may be presented by declaration and, if necessary, by testimony.  Although the court may accord great deference to the Department's expertise, the primary focus of the court is the determination of whether dismissal is in the interests of justice and the welfare of the minor.  On that basis the court may either grant the dismissal or order the Department to proceed with the petition."  (*Allen M*., at p. 1074.)

Here, the Department provided notice to the parties of its intention to seek dismissal of the section 300, subdivision (e) allegations.  At the jurisdiction/disposition hearing, counsel for the Department stated:  "[W]e actually believe the evidence as contained in the reports would suffice to sustain an (e) petition.  However, the (e) petition is used when we intend to bypass.  The Department does not intend to bypass this mother.  Therefore, we do not need the (e) petition.  We will be proceeding on the (a) and the

(b)."[5]  The minor's counsel requested that the petition be sustained as pleaded, including the section 300, subdivision (e) allegations, and did not oppose reunification services for the mother.  The minor's counsel did not seek to present any additional evidence.

Following argument, the juvenile court stated:  "What I wanted to make the record clear about was the fact that this matter was set for a long cause trial.  This Court received a phone call this afternoon that counsel thought, with an hour of argument, we could go forward.  I was willing to do that.  [¶]  I read the three reports, the jurisdiction/disposition report, as well as the two addendum reports.  I want the record to be clear I did not have time to read the briefs that counsel submitted.  So your arguments to me are the first time I've heard these arguments.  I didn't have time to read them.  I did specifically read Dr. Albin's letters that were attached to the back of the jurisdiction report.  [¶] . . . [¶] . . .  I am going to drop the 300(e) petition as requested.  There's nothing in the code that says the Court shall use every single jurisdiction ground that is available to it.  The code is written fairly loosely.  It says any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which adjudge that person to be a dependent child of the court.  And then it lists all of these.  [¶]  And nobody argued case law, and in particular, [minor's counsel] did not argue case law.  Given that the Department is not looking at a bypass, the 300(e) petition seems superfluous to the Court."

Even assuming that the juvenile court erred by failing to hold an order to show cause hearing and by using an improper standard for granting the Department's request to strike the section 300, subdivision (e) allegations, the minor has failed to show prejudice.  The minor contends that the "dismissal was inconsistent with the juvenile court's duty to

---

[5]  When a minor is declared to be within the jurisdiction of the court under section 300, subdivisions (a) or (b), reunification services are mandatory.  However, when jurisdiction is based on section (300), subdivision (e), there is a presumption against reunification services.  (*In re Troy Z.* (1992) 3 Cal.4th 1170, 1174.)

26

protect [the minor's] welfare and act in the interests of justice," and that a section 300, subdivision (e) finding would have affected the nature of the services provided to the mother. There is no merit to this argument.

We first note that the section 300, subdivisions (a) and (e) allegations in the petition pleaded the same facts, that is, that "the minor had suffered severe physical abuse that ha[d] resulted in serious brain trauma and seizures," and that the most recent injury occurred while he was in the care of the mother. After seeking the dismissal of the section 300, subdivision (e) allegations, the Department did not change the case plan recommendations for the mother. Following the hearing, the juvenile court adopted the Department's recommendations and ordered the mother, among other things, to attend a certified 52-week Child Abuser's Treatment program, complete a psychological evaluation, and participate in counseling or psychotherapy to address the issues of the minor's removal, discipline, and responsibility for the minor's injuries. The minor did not seek a different case plan for the mother at the hearing. Nor does he now claim that the juvenile court should have ordered other services for the mother.

The minor also contends that the dismissal of the section 300, subdivision (e) allegations will affect the juvenile court's determinations regarding whether the mother will receive additional time to reunify beyond the six month period or whether he should ever be returned to her custody. However, the Department's assessment and the juvenile court's determination at the six-month review will be governed by section 366.21, subdivision (e). With the exception of section 300, subdivision (g),[6] section 366.21 makes no distinction between the subdivisions of section 300 under which the minor was adjudicated a dependent of the court. Regardless of whether the section 300, subdivision (e) allegations were sustained, the Department's recommendation and the

---

[6]      When a child is removed under subdivision (g) of section 300 and the parents' whereabouts remain unknown, the juvenile court may set a section 366.26 hearing. (§ 366.21, subd. (e).)

juvenile court's determination as to whether the mother will reunify or receive additional services will be based on the mother's progress on her reunification case plan.

The minor next argues that if the mother reunifies with him and he is injured again, the juvenile court's history of this case will not accurately reflect the severe nature of the abuse. We disagree. The history will reflect that the juvenile court sustained the section 300, subdivision (a) allegations which state that the minor suffered nonaccidental brain trauma perpetrated by the mother. Moreover, in any future dependency, the juvenile court's finding of jurisdiction must be based on current circumstances. (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022.)

## 2. Amendment of Third Amended Petition

The minor contends that the juvenile court abused its discretion by denying his counsel's request to conform the petition to proof.

Section 348 provides that the provisions in the Code of Civil Procedure relating to the amendment of pleadings in civil actions shall apply to juvenile dependency petitions and proceedings. Amendments to conform to proof are permissible. (Code Civ. Proc., § 470.) "The court may likewise, in its discretion, after notice to the adverse party, allow, upon any terms as may be just, an amendment to any pleading or proceeding in other particulars . . . ." (Code Civ. Proc., § 473, subd. (a)(1).) "[T]he court's discretion will usually be exercised liberally to permit amendment of the pleadings. [Citation.]" (*Howard v. County of San Diego* (2010) 184 Cal.App.4th 1422, 1428.)

In the present case, the original petition alleged that in the beginning of June 2012, the mother, a pharmacist, used a half dose of a relative's Phenergan prescription to control the minor's vomiting despite manufacturer warnings against use for children under two years of age. The second amended petition removed the allegations that the mother had used Phenergan. In conducting the investigation, the social worker had learned that the Phenergan was given to the minor on July 4, 2012, not in June. Though

28

the mother initially stated that she administered the Phenergan, she and the maternal grandfather later claimed that the maternal grandfather administered the medication and it was unclear whether the mother was present when it was given to the minor.  It was also not known how much Phenergan the minor was given.  The mother initially stated that she gave him half of a Phenergan rectal 12.5 mg. suppository.  The mother later stated that the minor was given ".25 of adult dose."  The paternal grandfather told the social worker that he "cut a little bit of" Phenergan, gave it to the minor, and later told the mother what he had done.  The mother subsequently told Mr. G. that the minor was given "a diluted dose" of Phenergan.

Prior to the jurisdiction/disposition hearing, the minor requested that the section 300, subdivisions (a), (b), and (e) allegations be sustained with the amendment that "[t]he mother has knowingly administered or knew that [the minor] was being administered an adult dose of prescription strength Phenergan, an adult anti-seizure and anti-nausea medication that was not prescribed to [him] and was administered at an unknown dose."  The minor also requested that the juvenile court find true the allegation that "the mother attempted to administer higher dosages of Tylenol than directed by his attending physician."

The juvenile court exercised its discretion and denied the minor's request to conform the petitions to proof.  The juvenile court noted that "[w]hile it may be problematic that the mother engaged in the behavior she did with the medication, I don't think we need it as a supportive allegation.  There is information about it in the reports.  In the furtherance of justice, I don't think it's necessary in this case."

Here, the evidence does not support the proposed amendments.  First, no evidence was presented to the juvenile court to determine the amount of an adult dose of Phenergan.  Second, there was no evidence that the mother attempted to give the minor higher doses of Tylenol on more than one occasion.  Instead, the evidence was that the

29

mother told the paternal grandmother to give the minor a higher dose of Tylenol, and the paternal family members followed the attending physician's direction and then alerted the social worker.

Given that the evidence did not support the proposed amendments to the petition, the juvenile court did not abuse its discretion by denying the request.

Even assuming that the juvenile court abused its discretion, the minor has shown no prejudice. The minor argues that he suffered prejudice because "the true nature of the abuse . . . should have been reflected in the allegations found true." We disagree. The juvenile court authorized the psychological evaluator, the mother's therapist, and the Child Abuse Treatment program to have access to the court reports. Thus, the service providers will have the necessary information to address the medication issues with the mother.[7]

## III. Disposition

The order is affirmed.

_____
Mihara, J.

WE CONCUR:

_____
Elia, Acting P. J.

_____
Grover, J.

---

[7] The minor also claims that the Phenergan interfered with his receiving a correct diagnosis when he was first brought to the hospital. This was not, however, the result of the juvenile court's order.